## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

ASHTABULA AREA CITY SCHOOL
DISTRICT,

        Plaintiff,

v.                                                                     Civil Action No. _____

                                                     JURY TRIAL DEMANDED

LIBERTY MUTUAL FIRE
INSURANCE COMPANY,

        Defendant.

## COMPLAINT

COME NOW the Plaintiff, ASHTABULA AREA CITY SCHOOL DISTRICT (hereinafter "Plaintiff" or "Ashtabula" or "the District"), by and through counsel, and submit the following for their Complaint against LIBERTY MUTUAL FIRE INSURANCE COMPANY (hereinafter "Defendant" or "Liberty Mutual") for Breach of Contract, Breach of Contract II (Election-to-Repair Agreement), Negligence and Breach of the Implied Covenant of Good Faith and Fair Dealing (i.e. Bad Faith) . As grounds for this complaint, Plaintiff states as follows:

### I.  PARTIES

1.  Plaintiff Ashtabula Area City School District is a political subdivision of the State of Ohio as defined in Ohio Revised Code § 2744.0.

2.  Defendant is, and at all times relevant to this action was, a foreign corporation duly organized and existing under the laws of Massachusetts and authorized by the Superintendent of the Ohio Department of Insurance to engage in the business of writing and selling property insurance in this State.

## II. JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.      This Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(b), because the Insured Premises giving rise to the insurance dispute in controversy is located in Ashtabula County, Ohio, which is located in the Northern District, Eastern Division of this Court.

## III.   FACTS

### The Policy

5.      At all times relevant hereto, Ashtabula was insured pursuant to an insurance contract whereby Defendant agreed to insure the School Districts numerous buildings and other property located at multiple locations in Ashtabula County as further described in the Statement of Values (SOV) of the Insurance Contract, bearing Policy No. YW2-Z51-294276-054 (the "Policy"). The Policy's term was January 22, 2024, to January 22, 2025.

6.      The Policy is attached hereto as ***Exhibit A*** and is incorporated herein by reference as if set forth verbatim.

7.      The SOV is attached hereto as ***Exhibit B*** and is incorporated herein by reference as if set forth verbatim.

8.      The Policy provided insurance coverage for direct physical loss of or damage to Lakeside High School located at 6600 Sanborn Rd., Ashtabula, OH 44004 (the "Property) as listed in the SOV, and identified as location 3.1, and which is attached to the Policy with a total insured value limit of $82,235,529.00 with a blanket limit of $232,851,001.00 for all real and personal property.

9.     The policy includes additional coverages as listed in the "Coverage Extension" portion of the policy and $1,000,000 in extra expense coverage.

**The Loss & Claim Investigation**

12.     Ashtabula owns and is the insured of Lakeside High School, which includes a two-story academic wing (~125,000 sq. ft.). On or about December 1, 2024, after approximately 54–60 inches of snowfall, the roof over the academic wing failed and collapsed under the weight of the accumulated snow on the roof.

13.     On January 3, 2025, the Saybrook Township Fire Department recommended demolition of the compromised roof. ***See Exhibit C***.

14.     At Liberty Mutual's direction, Signal Restoration, began roof demolition on or about January 28, 2025. ***See Exhibit D***.

15.     Acting as the District's property insurer, Liberty Mutual directed mitigation and subrogation activities, including engaging Signal Restoration and others to remove roof sections for analysis; ultimately, Liberty Mutual directed removal of the entire roof over the high school's academic wing, leaving the wing exposed to the elements for months and resulting in snow and rain intrusion.

16.     On February 4, 2025, the District retained Alex N. Sill Company, LLC (Sill) with offices at 6000 Lombardo Center, Suite 600, Cleveland, OH 44131 as their public adjuster to assist them with documenting their claim.

17.     Sill's preliminary scope of damages contemplated repairs including masonry work at impacted second-floor areas, replacement of interior finishes and mechanical, electrical, and plumbing (MEP) components, and replacement of the roof.

18.     On March 17, 2025, the District's engineers, Barber & Hoffman, opined that the extent of structural repairs to second-floor masonry walls was extensive and that, given demolition and

repair challenges, it may be more effective from a time and cost perspective, to remove and rebuild the second-floor walls in their entirety. ***See Exhibit E***.

19.     Liberty Mutual disagreed with the District's engineering opinions and refused to pay for complete demolition.

20.     The removal of the roof, which resulted in the high school being exposed to the elements and ongoing water intrusion, concerned the District.

21.     Due to those concerns, in late February/early March 2025 the District retained Auburn Environmental, an industrial hygienist, to investigate moisture conditions within the high school.

22.     On March 27, 2025, Auburn Environmental reported moisture with microbial and bacterial growth within the high school's concrete block wall cavities. Auburn determined that in-place cleaning of insulation within the high school's concrete block walls was impractical and noncompliant with the Institute of Inspection Cleaning and Restoration Certification (IICRC) guidelines.

23.     By April 2, 2025, the District had provided reports from their experts, including Auburn Environmental, the architect, and structural engineers, to Liberty Mutual.

24.     Based on the extensive investigations conducted by the foregoing experts, the District advised Liberty Mutual that the academic wing should be deemed a total loss, with the building needing to be demolished to the slab.   This recommendation was due to extensive water, masonry and microbial damage to and within insulated exterior concrete block walls.

25.     The District requested an in-person meeting with Liberty Mutual on April 11, 2025, to discuss their concerns. Liberty Mutual declined to meet and stated it would be issuing a request for information (RFI).

26.     Inspections of light-gauge truss roof systems in other portions of the high school revealed additional damage consistent with compression/overload from the same snow event.

4

27.     The District's engineer's report was shared with Liberty Mutual.  On April 14, 2025 the District submitted a claim for the full replacement of remaining light-gauge truss roof systems.

28.     On April 16, 2025, Liberty Mutual issued their building and business personal property estimates with the Actual Cash Value (ACV) damages of $21,275,922.08 and with Replacement Cost Value (RCV) damages of $24,936,986.66.

29.     On May 22, 2025, at a meeting of the parties and experts, Liberty Mutual shared that they had an environmental company (Farmer)  "peer review" the Auburn Environmental report.

30.     On June 17, 2025, Farmer conducted their first environmental inspection of the High School.

31.     Liberty provided the environmental report from Farmer Environmental in which they state that the took samples of the interior of the CMU block walls within the academic wing and found that "Twenty-seven (27) samples were positive for gram-negative bacteria and 6 samples were positive for gram-positive bacteria with concentrations ranging from 100 to >3,000,000 colony-forming units (CFUs) per swab. Gram-negative and gram-positive results were also found in the control areas at lower concentrations"  and concluded that "this assessment indicates the presence of gram-negative and gram-positive bacteria within the wall cavities. However, direct exposure of the wall cavity to occupants is not intended or likely. Disinfection within the concrete block cavities is not warranted." However, Farmer Environmental cannot rule out the existence of environmental conditions; environmental concerns can escape detection using Farmer's testing

methods, and the passage of time and housekeeping may result in a change of environmental conditions.[1]  *See Exhibit F.*[2]

32.     Farmer identified toxins in the exterior block walls. Its Farmer's position that the toxins will remain in the walls and do not need to be removed.  Liberty Mutual contends that the exterior concrete block walls can be dried with insulation left in place. They maintain that position even though all of Ashtabula's experts dispute that is an appropriate way to deal with the toxins inside the walls. Further, the District's experts state that the hybrid open-closed cell nature of some of the insulation would also make fully drying the walls an impossible task, thus necessitating demolition of  the walls.

33.     On June 26, 2025, Liberty Mutual issued a reservation of rights invoking the insured's duties to protect property and proposing "stabilization" of only the first floor via desiccant dehumidification,  which would appear to be impossible to accomplish, given the building's missing roof and both floors being exposed to weather conditions. Liberty Mutual retained the firm of BMS Cat to implement the foregoing procedure.

34.      After a site meeting by BMS Cat, they informed Liberty Mutual that their proposed mitigation effort would be impossible.  Liberty Mutual then revised its recommendation to wiping down walls and placing air movers.  Their mitigation process did not address microbial growth within exterior walls or the continuing exposure to all weather events.

---

[1]  Farmer is not responsible for the conclusions, opinions, or recommendations made by others based on the visual field reconnaissance and information derived from this report.
Keep in mind that air sampling for mold provides information only for the moment in time in which the sampling occurred, much like a snapshot. Air sampling will reveal, when properly done, what was in the air at the moment when the sample was collected.
It should be noted that this assessment cannot absolutely rule out the existence of any environmental concerns at a given facility. This assessment has been based upon limited available prior subject site history, observable conditions, activities at the site, and laboratory analysis of the ambient air samples collected during the site investigation. Existing environmental concerns can escape detection using these methods. Additionally, the passage of time and housekeeping may result in a change in the environmental conditions

35.     BMS Cat conducted the wiping down of walls on the first level, charging Liberty Mutual $42,362.46.

36.     On June 30, 2025, Barber & Hoffman opined that direct damage to the cold-formed metal truss system, due to overloading from the snow, was widespread and the entire cold-formed truss roof structure should be replaced in the remaining buildings at the High School. ***See Exhibit G***.

37.     On July 1, 2025, the District notified Liberty Mutual that inspections had begun for similar light-gauge truss systems at other schools in the District with similar observed damages; however, those locations are not currently part of this lawsuit.

38.     On July 11, 2025, Liberty Mutual issued an updated building estimate totaling $27,355,290.76 RCV damages and $25,343,448.57 ACV damages.  Liberty Mutual stated in the estimate revision it added masonry work, certain truss repairs, classroom speakers, adjusted door hardware/frames/temporary power, confirmed inclusion of fire alarm/security, and removed "dry-out" costs to be considered separately.

39.     The District asked Liberty Mutual to separate estimates between the academic wing and rear building.

40.     The District requested Liberty Mutual's environmental report and supporting laboratory test results.

41.     The District requested Liberty Mutual's window and electrical box inspection status.

42.     Liberty Mutual did not provide a constructive total loss determination and could not identify a threshold, even as its estimate approached approximately 70–76% of the District's rebuild cost for the academic wing, depending on the iteration. ***See Exhibit H.***

43.     On September 10, 2025, Ashtabula's estimator Blundall Associates Inc. issued a repair estimate of $56,384,528. ***See Exhibit I***.

44.     Throughout March–July 2025, the District repeatedly requested funding and claim administration consistent with the Policy, including advances, ACV payments within promised timelines, and clarity on professional fees coverage.

45.     Liberty Mutual initially promised an ACV building payment within 30 days of March 3, 2025.

46.     The District executed proofs of loss for undisputed/advance payments.

47.     Liberty Mutual has refused to provide native estimate files and delayed or provided limited consultant data.

48.     Liberty Mutual's handling of the claim prolonged the building's exposure and worsened conditions at the academic wing, by removing the roof and leaving the building unprotected for months.

49.     Liberty Mutual's conduct by proposed superficial building "stabilization", ignoring contaminated water and microbial growth within the insulated concrete block cavities that make up the walls of the high school building, delaying total-loss decisions, despite repair estimates approaching or exceeding constructive total loss thresholds, and withholding or delaying reports while disputing the District's expert findings have had an extremely detrimental effect on the school building and the insured.

50.     The District consistently cooperated, provided expert reports and data, facilitated site access, and requested meetings to resolve issues, while Liberty Mutual failed to timely and fairly evaluate and settle the claim, insisted on impractical mitigation measures, and attempted to minimize covered loss by mischaracterizing extensive snow-event damage as pre-existing mechanical or installation issues, without an adequate basis.

51.     By August 6, 2025, the parties had reached an impasse.

8

52.     Defendant received multiple requests on June 17, 2025, September 22, 2025, and October 20, 2025, to issue payments for Ashtabula's incurred Extra Expenses, which are covered under the policy.  Yet, Liberty Mutual has failed to make any payments for extra expenses.

53.     Liberty Mutual has indicated they are not in agreement with the estimate and expert findings submitted by the insured.  However, Liberty Mutual has failed to provide an explanation as to why payments for the damages and Extra Expenses have not been made.

54.     The Defendant has failed to acknowledge or respond to communications within specified time frames.

55.     Liberty Mutual's failure to act in good faith is further exemplified by their unilateral decision to remove the high school roof without any plan to protect the building or mitigate future damage to the building from it being exposed to the elements.

56.     Defendant has repeatedly failed to provide a sufficient explanation regarding its decisions as to what they believed the repairs should be, how those repairs to bring the high school back to its pre-loss condition would be accomplished, and how the safety of the attending students and staff could be assured.

57.     Liberty Mutual has failed to conduct timely, appropriate investigations of the claim and has been the source of unreasonable delays. The Defendant was alerted to moisture concerns in academic wing of the high school in March 2025.  Yet, Liberty Mutual didn't do an inspection or any testing regarding the moisture concerns until June 16, 2025.

58.     Liberty Mutual has made unreasonable settlement offers.  After being apprised of an $8.6 million dollar shortfall in their own estimate, due to their neglecting to incorporate the costs for a temporary roof and necessary mitigation, they have failed to correct their estimate.

59.     Liberty Mutual cannot articulate when it would deem this claim a constructive total loss, even as its numbers approached 80% of the rebuild cost.  Further, Liberty Mutual's estimates

do not fully account for: a.) the critical drying/mitigation they contend is necessary, or b.) a temporary roof, which is also necessary if their repair approach is to be followed.

60.     The Liberty Mutual policy in this case is specifically written to cover schools. Knowing Ashtabula has to comply with Ohio Revised Code §5705.412 and have all of the necessary funds, prior to being able to enter into a contract for the repairs, Liberty Mutual is strictly enforcing its 2-year requirement for all repairs to be completed to receive the Policy's Replacement Cost benefits. Liberty Mutual's pursuing this course of conduct will result in significant financial damage to the district.

61.     Liberty Mutual's claim handling has caused significant additional expense and delay, including extended mitigation, expert costs, and operational impacts, while the District only sought fair payment for building, business personal property, other coverages, and extra expense components under the Policy.

<u>**The Loss is Compensable Under the Policy**</u>

62.     The Policy was in full force and effect at the time of the Loss.

63.     The Loss is compensable under the terms of the Policy.

64.     Ashtabula fulfilled all of their duties under the Policy.

65.     Even though Ashtabula fulfilled all duties imposed upon them by the Policy and are at no fault in this matter, Defendant has wrongfully failed and refused to fully and promptly pay Ashtabula's full claim for insurance proceeds.

66.     Defendant's refusal to pay Ashtabula the amounts owed under the Policy is without justification and constitutes a breach of contract.

67.     As a direct and proximate cause of Defendant's breach of contract, Ashtabula has sustained substantial compensable losses, including all amounts due Ashtabula under the Policy.

68.     Defendant's refusal to pay the money and benefits due and owing Ashtabula under the Policy caused Ashtabula to have to seek legal counsel, and to initiate this Complaint to recover the insurance proceeds and/or other Policy benefits to which they are entitled.

## IV.   CAUSES OF ACTION

### COUNT I
### Breach of Contract I

69.     The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference, as if set forth verbatim.

70.     The Policy issued by Defendant was a binding contract and is supported by valid consideration.

71.     Defendant is in material breach of the Policy and is liable to Ashtabula in the maximum amount allowed by the Policy for the Loss. Specifically, Defendant's breach of contract includes the following, without limitation: (a) Defendant's failure and refusal to pay the amounts owed to Ashtabula for the Loss pursuant to the insurance coverage afforded by the Policy; and (b) Defendant's failure and refusal to promptly and fully honor Ashtabula's claim for insurance benefits.

72.     As a result of Defendant's breach of contract, Ashtabula has sustained substantial, compensable losses in an amount equal to the Policy benefits due Ashtabula, as a result of the Loss.

73.     Defendant is liable to Ashtabula for their losses.

74.     Defendant failed to "exercise good faith in the processing of the insurance claim of its insured, where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor[e]". *Zoppo v. Homestead Ins. Co., 644 N.E.2d 397 (1994),* where the court quoted from *Staff Builders, Inc. v. Armstrong,  525 N.E.2d 783 (1988).*

75.     Defendant knew, or reasonably should have known, that Ashtabula was justifiably relying on the money and benefits due them under the terms of the Policy. Nevertheless, acting with

conscious disregard for Ashtabula's rights and with the intention of causing, or willfully disregarding the probability of causing, unjust hardship on Ashtabula, Defendant consciously ignored the entirety of Ashtabula's valid claim, and thus withheld monies and benefits rightfully due Ashtabula.

## COUNT II
## Breach of Contract II (Election-to-Repair Agreement)

76.     The allegations contained in preceding paragraphs of this Complaint are incorporated herein by reference, as if set forth verbatim.

77.     Liberty Mutual exercised its right under the Policy to conduct or control repairs by directing Signal Restoration to demolish the roof of the academic wing for analysis and mitigation.

78.     By electing to take control over the demolition, mitigation, and repair, Liberty Mutual entered into an implied in fact or implied at law secondary repair contract with Ashtabula, obligating Liberty Mutual to perform and oversee repairs in a commercially reasonable manner, in order to return the Property to its pre-loss condition.

79.     Liberty Mutual breached that repair contract by: directing full roof removal and then failing to implement or fund commercially reasonable temporary protection measures to secure the structure; leaving the academic wing exposed to weather for months; proposing inadequate "stabilization" measures that ignored contaminated water and microbial growth within exterior concrete block cavities in the walls; and delaying decisions necessary to protect and restore the Property.

80.     Alternatively, by electing to take control over the demolition, mitigation, and repair, Liberty Mutual  breached the insurance policy contract by directing full roof removal and then failing to implement or fund commercially reasonable temporary protection measures to secure the

structure; leaving the academic wing exposed to weather for months; proposing inadequate "stabilization" measures that ignored contaminated water and microbial growth within exterior concrete block cavities in the walls; and delaying decisions necessary to protect and restore the Property.

81.     Liberty Mutual's breach foreseeably and proximately caused additional damage and loss to the academic wing, including widespread moisture intrusion, microbial contamination, masonry damage, and increased repair costs, well beyond what would have occurred with commercially reasonable repair and protection, together with consequential damages.

82.     As a result of Liberty Mutual's breach of the repair agreement, Ashtabula suffered damages in an amount to be determined at trial, including all additional damages caused by the breach, whether or not those additional damages would have been covered under the original Policy benefits.

## COUNT III
### Negligence

83.     The allegations contained in preceding paragraphs of this Complaint are incorporated herein by reference, as if set forth verbatim.

84.     Liberty Mutual and the contractors it directed owed Ashtabula a duty to exercise reasonable care in performing demolition, repair, mitigation, and protection at the Property, once Liberty Mutual elected to control those activities.

85.     Liberty Mutual breached its duty of reasonable care by directing demolition of the roof without implementing reasonable temporary protection to prevent further damage; by failing to timely provide or fund adequate weatherproofing or a temporary roof; and by proposing superficial stabilization inadequate to address known contaminated water intrusion and microbial conditions within exterior concrete block walls.

86.     Liberty Mutual's negligent handling of the demolition and mitigation proximately caused extensive additional water intrusion, microbial growth, masonry deterioration, and increased scope and cost of repairs to the academic wing, as well as related consequential losses.

87.     As a direct and proximate result, Ashtabula suffered damages in an amount to be determined at trial.

### Count IV
### Breach of Implied Covenant of Good Faith and Fair Dealing & Unfair Claim Settlement Practices (Bad Faith)

88.     The allegations contained in the preceding paragraphs of this Complaint are incorporated by reference, as if set forth verbatim herein.

89.     In addition to the above count, every contract in the State of Ohio requires the parties to act in good faith and deal fairly with all parties to the contract.

90.     Pursuant to Defendant's duty to act in good faith and deal fairly with Ashtabula, Defendant had to act honestly and fairly and show good faith towards Ashtabula when investigating the claim.

91.     Pursuant to Defendant's duty to act in good faith and deal fairly with Ashtabula, Defendant is not to do anything that would destroy or damage Ashtabula's ability to receive the benefits of the Insurance Agreement.

92.     Pursuant to Defendant's duty to act in good faith and deal fairly with Ashtabula, Defendant is prohibited from exercising improper discretion and performing their contractual obligations in bad faith.

93.     Pursuant to Defendant's duty to act in good faith and deal fairly with Ashtabula, Defendant is not to act in a manner which is contrary to the spirit of the insurance policy.

94.     Pursuant to Defendant's duty to act in good faith and deal fairly with Ashtabula, Defendant  is  not to take opportunistic advantage in a way that could not have been contemplated at the time of the entering into the insurance policy.

95.     Pursuant to Defendant's duty to act in good faith and deal fairly with Ashtabula, Defendant is required to act honestly and reasonably, when seeking to enforce the terms of the Insurance Agreement.

96.     Pursuant to Defendant's duty to act in good faith and deal fairly with Ashtabula, Defendant is required to conduct itself in a manner that is faithful to the parties' agreed common purpose and in a manner consistent with the other party's justified expectations.

97.     Pursuant to Defendant's duty to  act in good faith  and deal fairly with Ashtabula, Defendant is not to act in bad faith, dishonestly, or with improper motive designed to destroy or damage Ashtabula's  right  to  receive  benefits  or  reasonable  expectations  of  the  Insurance Agreement.

98.     Pursuant to Defendant's duty to act  in good faith  and deal fairly with Ashtabula, Defendant has a duty not to abuse its discretionary power.

99.     Pursuant to Defendant's duty to act in good faith and deal fairly with Ashtabula, Defendant cannot take advantage of Ashtabula's circumstances for its benefit.

100.    Defendant's actions or omissions, in failing to provide coverage to Ashtabula, after approving Ashtabula's claim, was a breach of its duty of good faith and fair dealing.

101.    Defendant repeatedly failed to provide sufficient explanation for its decisions, as to what was and wasn't covered.

102.    Defendant received multiple requests on June 17, 2025, September 22, 2025, and October 20, 2025, to issue payments for Ashtabula's incurred Extra Expenses, which are covered under the policy.  Yet, Liberty Mutual has failed to make any payments for Extra Expenses.

103.    Liberty Mutual has indicated they are not in agreement with the estimate and expert findings submitted by Ashtabula.  However, Liberty Mutual has failed to provide an explanation as to why payments for the damages and Extra Expenses have not been made.

104.    Liberty Mutual has failed to acknowledge or respond to communications within specified time frames.

105.    Liberty Mutual has been informed that their estimates don't incorporate all of the covered damages, but they have failed to correct the shortcomings in their estimates.

106.    Liberty Mutual has failed to conduct timely, appropriate investigations of the claim and has been the source of unreasonable delays. Liberty Mutual was alerted to moisture concerns in academic wing of the high school in March 2025.  Yet, Liberty Mutual didn't do an inspection or any testing regarding the moisture concerns until June 16, 2025.

107.    Additional unreasonable delays were due to Liberty Mutual initially not having engineers investigate roof damage to the rear of the high school building.  Liberty Mutual did so only after the District hired engineers to outline the specific areas of damage for Liberty Mutual to inspect.

108.    Liberty Mutual's failure to act in good faith is further exemplified by their unilateral decision to remove the high school roof without any plan to protect the building or mitigate future damage to the building from it being exposed to the elements.

109.    Liberty Mutual has repeatedly failed to provide a sufficient explanation regarding its decisions as to what they believed the repairs should be, how those repairs to bring the high school back to its pre-loss condition will be accomplished, and how the safety of the attending students and staff can be assured.

110.    Liberty Mutual 's actions or omissions in not considering Sill's analysis of the cause of Ashtabula's damage, when  denying Ashtabula's claim under the  Insurance agreement, was a breach of its duty of good faith and fair dealing.

111.    Liberty Mutual has made unreasonable settlement offers.  After being apprised of an $8.6 million dollar shortfall in their own estimate, due to their neglecting to incorporate the costs for a temporary roof and necessary mitigation, they have failed to correct their estimate.

112.    Pursuant to Liberty Mutual's duty to act in good faith and deal fairly with Ashtabula, Liberty Mutual cannot take advantage of Ashtabula's circumstances to its benefit.  After Liberty Mutual's actions compromised the High School building.  Liberty Mutual is now seeking to take advantage of the circumstances created by them, by blaming Ashtabula. Liberty Mutual is requiring Ashtabula to protect the building at a cost of over $8 million dollars.

113.    Liberty Mutual is requiring Ashtabula to repair the building by December of 2026, while at the same time refusing to pay the necessary insurance funds to place the building in its pre-loss condition. Liberty Mutual is taking this position knowing that Ashtabula has to comply with Ohio Revised Code §5705.412 and have the funds prior to engaging in a contract to have the repair work performed.

114.    Liberty Mutual's actions or omissions were done in a manner to take and/or attempt to take opportunistic advantage of Ashtabula, which was a breach of its duty of good faith and fair dealing.

115.    Liberty Mutual's actions or omissions in failing to act honestly and reasonably when seeking to enforce the terms of the Insurance Agreement, was a breach of its duty of good faith and fair dealing.

116.    Liberty Mutual failed to  conduct itself in a manner that was faithful to the agreed common purpose and in a manner consistent with Ashtabula's justified expectations, which was a breach of its duty of good faith and fair dealing.

117.    Liberty Mutual's actions or omissions were made with a malicious purpose, in bad faith, and/or in a wanton or reckless manner.

118.    Liberty Mutual's actions or omissions were such that Defendant took advantage of Ashtabula's circumstances to its benefit.

119.    Liberty Mutual's actions or omissions were done in bad faith, dishonestly, and/or with an improper motive that was designed to preclude and/or damage Ashtabula's right to receive the benefits or the reasonable expectations of the Insurance Agreement, which was a breach of its duty of good faith and fair dealing.

120.    Liberty Mutual's actions or omissions were such that Defendant proximately harmed Ashtabula's reputation, and/or relationships with its students, parents and other county residents.

121.    Liberty Mutual's breaches of the duty of good faith and fair dealing were breaches of the Insurance Agreement, and Ashtabula has been damaged  as  a  proximate  result of such breaches.

122.    Liberty Mutual, by and through its representatives, told Ashtabula that Ashtabula's claim was valid, and that Liberty Mutual would perform all of the contracted services for Ashtabula.

123.    Liberty Mutual made these material representations with knowledge of their falsity or with utter disregard and recklessness for their falsity, with the intent of misleading Ashtabula into relying upon the false representations.

124.    Ashtabula justifiably relied upon Liberty Mutual's fraudulent misrepresentations.

125.    As a direct and proximate result of Ashtabula's reliance upon Liberty Mutual's false representations, Ashtabula has suffered other economic damages to house its students beyond the

policy's limitation of $1,000,000 for Extra Expenses and all additional expenses incurred to protect itself from Liberty Mutual's unlawful conduct, including costs and attorney's fees.

126.     Another indicator of Liberty Mutual's bad faith is the fact that just twelve days after the snow damage claim was made, Liberty Mutual cancelled the District's insurance policy.

127.     The most glaring illustration of the Defendant's bad faith is that they know extremely toxic substances are contained in the concrete block walls of the school.  Yet, they are not willing to eliminate that significant health concern and are willing to risk the lives and wellbeing of the high school students and staff,  while hoping that the toxins remain sealed within the concrete block walls forever.

## PRAYER FOR RELIEF

Pursuant to its statutory and common law rights, Plaintiff ASHTABULA AREA CITY SCHOOL DISTRICT respectfully requests the Court grant the following relief:

1. Enter judgment for Plaintiff on all Counts and award compensatory damages, including all amounts due under the Policy and all additional damages caused by Defendant's breaches and negligence;

2. Award restitution and pre- and post-judgment interest as permitted by law;

3. Award consequential damages proximately caused by Defendant's breach of the election-to-repair agreement and negligence;

4. Award extra-contractual and consequential damages for bad faith, including attorneys' fees where permitted, and punitive damages in an amount sufficient to punish and deter, as allowed by Ohio law;

5.   Award Plaintiff its costs of suit, including reasonable attorneys' fees, expert fees, and actual

      costs; and

6.   Grant such other and further relief as the Court deems just and proper.

### JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiff demands a trial by jury of all issues triable of right by jury.


                                    **MERLIN LAW GROUP, PLLC**

Date: November 3, 2025              /s/  W. Anthony Loe
                                    **W. Anthony Loe, Esq.**
                                    Ohio Bar No.: 0029528
                                    201 E. 5th Street, Suite 1900
                                    Cincinnati, OH 45202
                                    (513) 991-2160
                                    (513) 991-2253 (fax)
                                    WALoe@merlinlawgroup.com
                                    Ashtabula@merlinlawgroup.com
                                    Attorney for Plaintiff