# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

ASHTABULA AREA CITY SCHOOL DISTRICT,

        Plaintiff,

v.

LIBERTY MUTUAL FIRE INSURANCE COMPANY,

        Defendant.

Civil Action No. 1:25-cv-02362-CEF
JURY TRIAL DEMANDED

## SECOND AMENDED COMPLAINT

COMES NOW the Plaintiff, ASHTABULA AREA CITY SCHOOL DISTRICT (hereinafter "Plaintiff" or "Ashtabula" or "the District"), by and through counsel, and submits the following as its Second Amended Complaint against LIBERTY MUTUAL FIRE INSURANCE COMPANY (hereinafter "Defendant" or "Liberty Mutual") for Breach of Contract, Breach of Contract II (Election to Repair), Declaratory Judgment Action, and Bad Faith. As grounds for this second amended complaint, Plaintiff states as follows:

## I. PARTIES

1. Plaintiff Ashtabula Area City School District is a political subdivision of the State of Ohio as defined in Ohio Revised Code § 2744.0.

2. Liberty Mutual is, and at all times relevant to this action was, a foreign corporation incorporated in Wisconsin, and duly organized and existing under the laws of that State, with its principal place of business located in Boston, Massachusetts and headquarters located at 175

1

Berkeley Street, Boston MA 02116. Accordingly, there is complete diversity of citizenship between Plaintiff and the Defendant.

## II. JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4. This Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(b), because the Insured Premises giving rise to the insurance dispute in controversy are located in Ashtabula County, Ohio, which is located in the Northern District, Eastern Division of this Court.

## III.  FACTS

### The Policy

5. At all times relevant hereto, Ashtabula was insured pursuant to an insurance contract whereby Defendant agreed to insure the School Districts numerous buildings and other property located at multiple locations in Ashtabula County as further described in the Statement of Values ("SOV") of the Insurance Contract, bearing Policy No. YW2-Z51-294276-054 (the "Policy"). The Policy's term was effective January 22, 2024, through January 22, 2025.

6. The Policy is attached hereto as ***Exhibit A*** and is incorporated herein by reference as if set forth verbatim.

7. The SOV is attached hereto as ***Exhibit B*** and is incorporated herein by reference as if set forth verbatim.

8. The Policy provided insurance coverage for direct physical loss of or damage to Lakeside High School located at 6600 Sanborn Rd., Ashtabula, OH 44004 (the "Property") as listed in the SOV, and identified as location 3.1, and which is attached to the Policy with a total

insured value limit of $82,235,529.00 including a blanket limit of $232,851,001.00 for all real and personal property.

9.    The Policy also provided coverage for direct physical loss of or damage to six other District school buildings insured under the Policy, including: Huron Primary School (2300 Wade Ave), Ontario Primary School (2302 Wade Ave), Michigan Primary School (2304 Wade Ave), Erie Intermediate School (2306 Wade Ave), Superior Intermediate School (2308 Wade Ave), and Lakeside Junior High School (6620 Sanborn Road) (collectively, the "Additional Loss Locations").

10.    The Policy includes additional coverages as listed in the "Coverage Extension" portion of the Policy and $1,000,000 in Extra Expense coverage.

### The Loss & Claim Investigation

11.    Ashtabula owns and is the insured of Lakeside High School ("High School"), which includes a two-story academic wing, with a footprint of approximately 125,000 square feet.

12.    Ashtabula owns and is the insured of the Additional Loss Locations.

13.    On or about December 1, 2024, after approximately 54–60 inches of snowfall ("Loss Event"), the roof over the High School's academic wing failed and collapsed under the weight of the accumulated snow on the roof. The Additional Loss Locations also sustained damage from the Loss Event. The combined incidents resulting in damage to both the High School and Additional Loss Locations are collectively referred to as the "Loss."

14.    The District promptly reported the Loss to Liberty Mutual and was assigned claim number X69A010668 for the High School and claim number 791738110 for the Additional Loss Locations (collectively the "Claim").

15.    Liberty Mutual's concern regarding preserving evidence for its potential subrogation claim appears to have been paramount in its hierarchy of concerns.  As a result, Liberty Mutual and

its agents were constantly in and out of the significantly damaged academic wing of the High School.

16.     Members of the Saybrook Fire Department had to accompany Liberty Mutual's employees/agents when they entered the damaged academic wing of the Property, due to safety concerns.

17.     On January 3, 2025, the Saybrook Township Fire Department recommended demolition of the High School's compromised roof due to concerns that "the building continues to degrade daily, leaving it impossible to enter without grave danger to life". *See Exhibit C*.

18.     At Liberty Mutual's direction, Signal Restoration began roof demolition at the High School on or about January 28, 2025. *See Exhibit D*.

19.     Acting as the District's property insurer, Liberty Mutual directed mitigation and subrogation activities at the High School, including engaging Signal Restoration and others to remove roof sections for analysis. Ultimately, Liberty Mutual directed removal of the entire roof over the High School's academic wing, leaving the wing exposed to the elements for months and resulting in snow and rain intrusion.

20.     On February 4, 2025, the District retained Alex N. Sill Company, LLC ("Sill") with offices located at 6000 Lombardo Center, Suite 600, Cleveland, OH 44131 as its public adjuster to assist the District with documenting its Claim for the Loss.

21.     Sill's preliminary scope of damages contemplated repairs including masonry work at impacted second-floor areas of the High School, replacement of interior finishes and mechanical, electrical, and plumbing (MEP) components, and replacement of the roof.

22.     On March 17, 2025, the District's engineers, Barber & Hoffman, opined that the extent of structural repairs to second-floor masonry walls at the High School was extensive and that,

given demolition and repair challenges, it may be more effective from a time and cost perspective, to remove and rebuild the second-floor walls in their entirety. ***See Exhibit E***.

23. Liberty Mutual disagreed with the District's engineering opinions and refused to pay for complete demolition of the High School.

24. The removal of the roof, which resulted in the High School being exposed to multiple weather elements and ongoing water intrusion, concerned the District.

25. Due to those concerns, in late February/early March 2025, the District retained Auburn Environmental, an industrial hygiene firm, to investigate moisture conditions within the High School due to the Loss.

26. On March 27, 2025, Auburn Environmental reported moisture with microbial and bacterial growth within the High School's concrete block wall cavities. Auburn Environmental determined that in-place cleaning of the insulation to remove toxins contained within the High School's concrete block walls was impractical and noncompliant with the Institute of Inspection Cleaning and Restoration Certification (IICRC) guidelines.

27. By April 2, 2025, the District had provided reports from its experts, including Auburn Environmental, an architect, and structural engineers, to Liberty Mutual.

28. Based on the extensive investigations conducted by the foregoing experts and the numerous health and safety concerns noted by those experts as well as extensive water, masonry and microbial damage to and within insulated exterior concrete block walls, the District requested Liberty Mutual deem the academic wing of the High School a total loss, with the building being demolished to the slab.

29. The District requested an in-person meeting with Liberty Mutual for April 11, 2025, to discuss its concerns. Liberty Mutual declined to meet with the District and stated it would be issuing a request for information (RFI).

30.    Inspections of light-gauge truss roof systems in other portions of the High School revealed additional damage consistent with compression/overload from the same snow event.

31.    The District's engineer's report was shared with Liberty Mutual.

32.    On April 14, 2025, the District requested Liberty Mutual approve the full replacement of remaining light-gauge truss roof systems in the High School.

33.    On April 16, 2025, Liberty Mutual issued its building and business personal property estimates for the High School with Actual Cash Value ("ACV") damages noted as $21,275,922.08 and Replacement Cost Value ("RCV") damages noted as $24,936,986.66.

34.    On May 22, 2025, at a meeting between the parties and their experts, Liberty Mutual advised that it had retained an environmental consultation company ("Farmer Environmental") to conduct a "peer review" of the Auburn Environmental report.

35.    On June 17, 2025, Farmer conducted its first environmental inspection of the High School and sampled the interior of the CMU block walls within the academic wing.

36.    Liberty provided the report from Farmer Environmental in which they state they took samples of the interior of the concrete block (CMU) walls within the High School's academic wing and found that "Twenty-seven (27) samples were positive for gram-negative bacteria and 6 samples were positive for gram-positive bacteria with concentrations ranging from 100 to >3,000,000 colony-forming units (CFUs) per swab. Gram-negative and gram-positive results were also found in the control areas at lower concentrations." The Farmer Environmental report concluded that "this assessment indicates the presence of gram-negative and gram-positive bacteria within the wall cavities. However, direct exposure of the wall cavity to occupants is not intended or likely. Disinfection within the concrete block cavities is not warranted." However, Farmer Environmental cannot rule out the existence of any environmental concerns at a given facility; existing

environmental concerns can escape detection using Farmer's testing methods, and the passage of time and housekeeping may result in a change of environmental conditions.[1] *See Exhibit F.*

37.　　　Farmer Environmental identified toxins in the exterior block walls of the High School.

38.　　　Despite the presence of toxins, it is Farmer Environmental's position that the toxins can remain in the walls of the High School and do not need to be removed.

39.　　　Liberty Mutual takes Farmer Environmental's contention to bolster its position that the exterior concrete block walls of the High School can be dried with insulation and toxins left in place.

40.　　　Liberty Mutual maintains this position despite evidence to the contrary from all of the District's experts, who dispute this method as an appropriate or safe way to manage the toxins inside the High School's walls.

41.　　　Farmer Environmental/Liberty Mutual's position fails to consider the practical ramifications of this stance, including when a light switch plate or the cover to an electrical outlet is removed and causes toxic air to rush through the wall and risk exposure to students, faculty, or anyone physically present.

42.　　　Furthermore, the District's experts advise that demolition of the walls is the only feasible option given the hybrid open-closed cell nature of some of the insulation, which would make fully drying the walls an impossible task.

---

[1]  Farmer is not responsible for the conclusions, opinions, or recommendations made by others based on the visual field reconnaissance and information derived from this report.

Keep in mind that air sampling for mold provides information only for the moment in time in which the sampling occurred, much like a snapshot. Air sampling will reveal, when properly done, what was in the air at the moment when the sample was collected.

It should be noted that this assessment cannot absolutely rule out the existence of any environmental concerns at a given facility. This assessment has been based upon limited available prior subject site history, observable conditions, activities at the site, and laboratory analysis of the ambient air samples collected during the site investigation. Existing environmental concerns can escape detection using these methods. Additionally, the passage of time and housekeeping may result in a change in the environmental conditions

43.     On June 26, 2025, Liberty Mutual issued a reservation of rights, invoking the District's duties to protect property and proposing "stabilization" of only the first floor of the High School via desiccant dehumidification.

44.     Given the High School's missing roof and complete exposure to weather conditions on both the first and second floors, desiccant dehumidification would be impossible to accomplish.

45.     Despite the impracticality of desiccant dehumidification, Liberty Mutual retained the firm of BMS Cat to implement the foregoing procedure.

46.      After BMS Cat visited the High School site, it informed Liberty Mutual that the proposed mitigation effort of desiccant dehumidification would be impossible.

47.     Following the advisement from BMS Cat, Liberty Mutual revised its recommendation to wiping down the High School's walls and placing air movers.

48.     Liberty Mutual's revised mitigation process failed to address microbial growth contained within the High School's exterior walls or the building's continued exposure to all weather conditions.

49.     As requested by Liberty Mutual, BMS Cat conducted the wiping down of High School walls on the first level, charging Liberty Mutual $42,362.46.

50.      On June 30, 2025, consulting engineers Barber & Hoffman opined that direct damage to the cold-formed metal truss system in the High School, due to overloading from the snow, was widespread and the entire cold-formed truss roof structure should be replaced in the remaining buildings at the High School. ***See Exhibit G***.

51.      On July 1, 2025, the District notified Liberty Mutual that inspections had begun for similar light-gauge truss systems at other Additional Loss Locations, with similar observed damages.

52.     Also on July 1, 2025, Ashtabula City Manager James Timonere sent a letter to Liberty Mutual condemning the consideration of "drying out and remediating" the High School's total-loss structure after months of exposure, bowed walls, and pervasive mold as an attempt to cut costs; warning that delay jeopardizes student and staff safety and disrupts District operations; and he urged Liberty Mutual to  approve the full demolition of the High School and allow the District to begin rebuilding without further delay. He implored Liberty Mutual to, "Do the right thing by your client and the community that relies on you." *See Exhibit H.*

53.     Prior to the Loss-related roof collapse, the High School was an integral part of the Perry Nuclear Power Plant Plan.  As such, should an emergency be declared, the High School would serve as a monitoring/decontamination center for emergency workers and a reception center for the general public. *See Exhibit I.*

54.     On July 11, 2025, Liberty Mutual issued an updated building estimate for the High School totaling $27,355,290.76 in RCV damages and $25,343,448.57 in ACV damages.

55.     Liberty Mutual stated its estimate revision added masonry work, certain truss repairs, classroom speakers, adjusted door hardware/frames/temporary power, confirmed inclusion of fire alarm/security, and removed "dry-out" costs to be considered separately.  However, to date, Liberty Mutual has failed to provide the "dry-out" costs or a methodology for so doing, that is consistent with health and safety guidelines and the requisite testing, to ensure the safety of the process and the well-being of those conducting the remediation for the High School.

56.     Following receipt of Liberty Mutual's revised estimate for the High School, the District asked Liberty Mutual to separate out estimates between the academic wing and the rear building.

57.     The District requested Liberty Mutual's environmental report and supporting laboratory test results.

58.     The District requested Liberty Mutual's window and electrical box inspection status.

59.     Liberty Mutual's revised estimate for the High School did not provide a constructive total loss determination and did not identify a threshold for what it considered a constructive total loss, even as Liberty Mutual's estimate approached approximately 70–76% of the District's rebuild cost for the academic wing, depending on the iteration. ***See Exhibit J.***

60.     On September 10, 2025, the District's estimator, Blundall Associates Inc., issued a repair estimate for the High School of $56,384,528 RCV. ***See Exhibit K***. The Blundall estimate was subsequently revised in November 2025 to include depreciation, totaling $47,917,177 in ACV damages. ***See Exhibit L.***

61.     Throughout March–July 2025, the District repeatedly requested funding and claim administration consistent with the Policy, including advances, ACV payments within promised timelines, and clarity on professional fees coverage.

62.     Liberty Mutual initially promised a release of ACV building payment for the High School within 30 days of March 3, 2025.

63.     The District executed proofs of loss for the High School for undisputed/advance payments related to the Claim.

64.     Liberty Mutual has refused to provide native estimate files and delayed or provided limited consultant data to the District related to the Claim.

65.     Liberty Mutual's handling of the Claim prolonged the High School's exposure to the weather and worsened conditions at the academic wing, by removing the roof and leaving the building unprotected for months.

66.     Liberty Mutual's conduct by proposed superficial building "stabilization," ignoring contaminated water and microbial growth within the insulated concrete block cavities that make up the walls of the High School, delaying total-loss decisions, despite repair estimates approaching or

exceeding constructive total loss thresholds, and withholding or delaying reports while disputing the District's expert's findings have had an extremely detrimental effect on the High School and the insured.

67.     The High School is a community shelter for area disasters. As such, accepting any form of remediation methodology, which could endanger the public, would be antithetical to the use of the building and safety of its occupants.  ***See Exhibit M.***

68.     The District has consistently cooperated, provided expert reports and data, facilitated site access, and requested meetings to resolve issues, while Liberty Mutual has failed to timely and fairly evaluate and settle the Claim, insisted on impractical, if not dangerous, mitigation measures, and attempted to minimize a covered loss by mischaracterizing extensive snow-event damage as pre-existing mechanical or installation issues, without an adequate basis.

69.     By August 6, 2025, the Parties had reached an impasse on the High School Claim.

70.     The District made multiple requests to Liberty Mutual on June 17, 2025, September 22, 2025, and October 20, 2025, to issue payments for Ashtabula's incurred Extra Expenses, which are covered under the Policy.  Yet, despite these requests, Liberty Mutual has failed to release any benefits under the Policy for Extra Expenses damages.

71.     Liberty Mutual has indicated it is not in agreement with the estimate and expert findings submitted by the District. However, Liberty Mutual has failed to provide an explanation as to why payments for Claim-related damages and Extra Expenses have not been released.

72.     Liberty Mutual has failed to acknowledge or respond to communications within specified time frames.

73.     Liberty Mutual's failure to act in good faith is further exemplified by its unilateral decision to remove the High School roof without any plan to protect the building or mitigate future damage to the building from it being exposed to the elements.

74.     Liberty Mutual has repeatedly failed to provide a sufficient explanation regarding its decisions as to what it believes the repairs should be, how its proposed repairs to bring the High School back to its pre-Loss condition would be accomplished, and how the safety of attending students and staff could be assured.

75.     Liberty Mutual has failed to conduct timely, appropriate investigations into the Claim and has been the source of unreasonable delays.

76.     Liberty Mutual was alerted to moisture concerns in the academic wing of the High School in March 2025.  Yet, Liberty Mutual failed to inspect or perform any testing regarding the District's moisture concerns until June 17, 2025.

77.     Liberty Mutual has made unreasonable settlement offers related to the High School. After being apprised of an $8.6 million shortfall in its own estimate (due to neglecting to incorporate the costs for a temporary roof, necessary mitigation and appropriate environmental testing), Liberty Mutual has failed to correct its estimate.

78.     Liberty Mutual cannot articulate when it would deem this Claim for the High School as a constructive total loss, even as its numbers approached 80% of the rebuild cost.  Further, Liberty Mutual's estimates do not fully account for: a.) the critical drying/mitigation it contends is necessary,  b.) a temporary roof, which is also necessary, if its repair approach is to be followed, or c.) the requisite testing for toxins contained on site currently, during the remediation process and after the repairs have been completed.

79.     The Liberty Mutual policy in this case is specifically written to cover schools. Knowing Ashtabula has to comply with Ohio Revised Code §5705.412 and have all of the necessary funds, prior to being able to enter into a contract for the repairs.  Yet, Liberty Mutual is strictly enforcing its 2-year requirement for all repairs to be completed on the Loss to receive the Policy's

Replacement Cost benefits. Liberty Mutual's pursuing this course of conduct will result in significant financial damage to the district.

80.     Liberty Mutual's claim handling has caused significant additional expense and delay, including extended mitigation, expert costs, and operational impacts, while the District only sought fair payment for the Building, Business Personal Property, Extra Expense, and other coverage components under the Policy.

**Additional Loss Locations**

81.     At all relevant times, Liberty Mutual insured the District under the Policy for "numerous buildings at multiple locations," including buildings other than Lakeside High School.

82.     In addition to the Loss at Lakeside High School, the same extraordinary lake-effect snow event that impacted Ashtabula County in late November and early December 2024 also caused direct physical loss and/or damage to the Additional Loss Locations, including:

     a)  Huron Primary School, 2300 Wade Ave, Ashtabula, OH 44004;
     b)  Ontario Primary School, 2302 Wade Ave, Ashtabula, OH 44004;
     c)  Michigan Primary School, 2304 Wade Ave, Ashtabula, OH 44004;
     d)  Erie Intermediate School, 2306 Wade Ave, Ashtabula, OH 44004;
     e)  Superior Intermediate School, 2308 Wade Ave, Ashtabula, OH 44004; and
     f)  Lakeside Junior High School, 6620 Sanborn Road, Ashtabula, OH 44004.

83.     After the High School roof failure and collapse, the District acted prudently to evaluate whether the same snow event had compromised roof structural systems at other District buildings. Those concerns were well-founded because the High School roof section that failed used cold-formed steel ("CFS") pitched roof trusses, and other District buildings utilized similar CFS truss systems.

84.     The District retained structural engineering professionals to evaluate the Additional Loss Locations, including inspections of the CFS roof truss systems, to identify compromised members and assess causation. Those inspections documented widespread damage conditions in the

CFS trusses at the Additional Loss Locations, including buckling, bowing, torsional warping, and other deformations, consistent with load-related structural distress rather than isolated cosmetic issues.

85.     Seidler Engineering, Inc. ("Seidler") inspected the Additional Loss Locations and issued findings and opinions regarding the condition of the CFS roof trusses and the cause of observed damage. Seidler concluded that the snowfall event in late November and early December 2024 was the primary contributing factor to the observed damage, including because the damage appeared at corresponding locations across adjacent trusses and exhibited a consistent pattern indicating systemic structural overloading rather than isolated pre-existing or incidental damage.

86.     The District provided Liberty Mutual notice and documentation of the damages observed at the Additional Loss Locations and sought coverage for the direct physical loss and/or damage and the resulting repair and reinforcement needed to restore those buildings to a safe, functional condition for public-school use.

87.     The District also presented the damage at the Additional Loss Locations under the Liberty Mutual Policy and arising from the same Loss Event. Liberty Mutual nevertheless treated the Additional Loss Locations through a separate claim process and assigned Claim No. 791738110.

88.     Liberty Mutual then retained Engineering Systems Inc. ("ESi") to investigate and evaluate the claimed damage at the Additional Loss Locations and to review and respond to the Seidler findings and conclusions.

89.     ESi's investigation and report were not an independent, open-ended assessment of all conditions at the Additional Loss Locations. Rather, ESi's inspection was limited to reviewing the alleged damage instances identified in Seidler's report and selected areas identified by Liberty Mutual and its representatives.

90. In its report, ESi asserted, among other things, that:

    a) the snow event produced roof snow loading on the subject roofs of approximately 14.7 to 16.5 psf—purportedly below a design roof snow load range of 18.3 to 23.1 psf—and therefore did not overload the roof systems;

    b) there was no evidence that the capacity of the truss members or connections was exceeded or that they were damaged due to the snow event; and

    c) "90% or more" of the members referenced in Seidler's report and inspected by ESi exhibited indicators of mechanically induced damage or damage not related to the snow event, which ESi attributed to fabrication, transportation, staging, or installation issues.

91. ESi further asserted that observed dents, bends, scrapes, scratches, strap markings, sharp distortions, and aligned damage patterns between adjacent web members were inconsistent with structural overloading and instead indicated mechanical damage (including damage while stacked prior to installation). ESi also suggested that certain members may have been forcibly bent during installation to match shop drawings or align with bracing members.

92. Although ESi observed conditions requiring further review and reinforcement or modification by a licensed engineer, including modified or missing bracing and even an unattached web member, ESi nevertheless attempted to attribute the observed truss damage to non-covered causes and to exclude the snow event as the cause of loss.

93. Liberty Mutual has relied on ESi's report and conclusions to deny coverage and refuse payment for the direct physical loss and damage observed at the Additional Loss Locations.

94. ESi's attempt to exclude the snow event as a cause of the damage at the Additional Loss Locations is inconsistent with Seidler's findings and conclusions, which documented widespread structural distress patterns across adjacent trusses and concluded that the extraordinary snowfall event was the primary contributing factor to the observed truss damage.

95. Liberty Mutual's refusal to provide coverage and payment for the damages observed at the Additional Loss Locations, despite the Policy being in force, the District's compliance with its post-loss obligations, and the direct physical loss and damage caused by the extraordinary snowfall,

constitutes a further breach of the Policy.

96.     Liberty Mutual's breach has forced the District to shoulder the costs of investigation, stabilization, repair planning, and necessary repairs and reinforcements needed to protect students, staff, and the public and to restore safe operations at the Additional Loss Locations.

### The Losses are Compensable Under the Policy

97.     The Policy was in full force and effect at the time of the Loss.

98.     The Loss is compensable under the terms of the Policy.

99.     Ashtabula fulfilled all of its duties under the Policy.

100.    Even though Ashtabula fulfilled all duties imposed upon it by the Policy and is at no fault in this matter.  Liberty Mutual wrongfully refused to fully and promptly pay Ashtabula's full Claim for insurance proceeds.

101.    Liberty Mutual's refusal to pay Ashtabula the amounts owed under the Policy is without justification and constitutes a breach of contract.

102.    As a direct and proximate cause of Liberty Mutual's breach of contract, Ashtabula has sustained substantial compensable losses, including all amounts due Ashtabula under the Policy.

103.    Liberty Mutual's refusal to pay the money and benefits due and owing Ashtabula under the Policy necessitated Ashtabula seeking out legal counsel, and to initiate this lawsuit to recover the insurance proceeds and/or other Policy benefits to which it is entitled.

### IV.   CAUSES OF ACTION

### COUNT I
### Breach of Contract – Both the High School and Additional Loss Locations

104.    The allegations contained in the preceding paragraphs of this Second Amended Complaint are incorporated herein by reference, as if set forth verbatim.

16

105. The Policy issued by Liberty Mutual was a binding contract and is supported by valid consideration.

106. Defendant is in material breach of the Policy and is liable to Ashtabula in the maximum amount allowed by the Policy for the Losses at both the High School and the Additional Loss Locations. Specifically, Defendant's breach of contract includes the following, without limitation: (a) Defendant's failure and refusal to pay the amounts owed to Ashtabula for the Losses at both the High School and the Additional Loss Locations pursuant to the insurance coverage afforded by the Policy; (b) Defendant's failure and refusal to promptly and fully honor Ashtabula's Claims for insurance benefits; and, (c) Defendant's denial of coverage and refusal to provide payment for the Additional Loss Locations despite direct physical loss/damage observed and documented at those insured premises.

107. As a result of Defendant's breach of contract, Ashtabula has sustained substantial, compensable losses in an amount equal to the Policy benefits due Ashtabula, as a result of the Losses at both the High School and the Additional Loss Locations..

108. Defendant is liable to Ashtabula for the Losses.

109. Defendant failed to "exercise good faith in the processing of the insurance claim of its insured, where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor[e]". *Zoppo v. Homestead Ins. Co., 644 N.E.2d 397 (1994),* where the court quoted from *Staff Builders, Inc. v. Armstrong,  525 N.E.2d 783 (1988).*

110. Defendant knew, or reasonably should have known, that Ashtabula was justifiably relying on the money and benefits due under the terms of the Policy. Nevertheless, acting with conscious disregard for Ashtabula's rights and with the intention of causing, or willfully disregarding the probability of causing, unjust hardship on Ashtabula, Defendant consciously

ignored the entirety of Ashtabula's valid Claims, and thus withheld monies and benefits rightfully due Ashtabula.

## COUNT II
### Breach of Contract II (Election-to-Repair) – Only in Relation to High School

111.    The allegations contained in the preceding paragraphs of this Second Amended Complaint are incorporated herein by reference, as if set forth verbatim.

112.    Liberty Mutual exercised its right under the Policy to conduct or control repairs by directing Signal Restoration to demolish the roof of the academic wing of the High School for analysis and mitigation.

113.    By electing to take control over the demolition, mitigation, and repair, Liberty Mutual entered into an implied in fact or implied at law secondary repair contract with Ashtabula, obligating Liberty Mutual to perform and oversee repairs in a commercially reasonable manner, in order to return the Property to its pre-loss condition.

114.    Liberty Mutual breached that repair contract by directing full roof removal and then failing to implement or fund commercially reasonable temporary protection measures to secure the structure; leaving the academic wing exposed to weather for months; proposing inadequate "stabilization" measures that ignored contaminated water and microbial growth contained within exterior concrete block cavities in the walls; and delaying decisions necessary to protect and restore the Property.

115.    Alternatively, by electing to take control over the demolition, mitigation, and repair, Liberty Mutual  breached the insurance policy contract by directing full roof removal and then failing to implement or fund commercially reasonable temporary protection measures to secure the structure; leaving the academic wing exposed to weather for months; proposing inadequate

"stabilization" measures that ignored contaminated water and microbial growth contained within the concrete block cavities of the exterior walls; and delaying decisions necessary to protect and restore the Property.

116. Liberty Mutual's breach foreseeably and proximately caused additional damage and loss to the academic wing, including widespread moisture intrusion, microbial contamination, masonry damage, and increased repair costs, well beyond what would have occurred with commercially reasonable repair and protection, together with consequential damages.

117. As a result of Liberty Mutual's breach of the repair agreement, Ashtabula suffered damages in an amount to be determined at trial, including all additional damages caused by the breach, whether or not those additional damages would have been covered under the original Policy benefits.

## COUNT III
## Declaratory Judgment Regarding Availability of Replacement Cost Benefits - Both the High School and Additional Loss Locations

118. The allegations contained in the preceding paragraphs of this Second Amended Complaint are incorporated herein by reference, as if set forth verbatim.

119. The Liberty Mutual insurance Policy entitles Ashtabula to receive Replacement Cost Value (RCV) amounts for repairs or replacements and for expenditures incurred when complying with ordinances and laws.

120. The Policy issued by Defendant to Ashtabula Area City School District includes a provision under Section M. VALUATION which states:

1. **Replacement Cost**

   a. Loss or damage to Covered Property will be valued at the time and place of the loss at **replacement cost** unless otherwise indicated in Paragraphs **2.** and **3.** below or by endorsement.

   b. **We** will not pay **replacement cost** until the lost or damaged property is repaired or replaced. If repairs or replacement are not made within two years after the date of the physical loss, **we** will pay only the **actual cash value** amount.

121.    The Policy also states, in the Ordinance or Law Coverage Extension, "We will not pay for any costs: (1) Unless they are incurred within two years from the date of loss."

122.    Plaintiff Ashtabula Area City School District is a political subdivision of the State of Ohio and, pursuant to Ohio Revised Code § 5705.412, cannot enter into any contract involving the expenditure of money for repairs or reconstruction unless and until it has all required funds in hand.

123.    After the Losses occurred at both the High School and Additional Loss Locations, Defendant failed and/or refused to issue timely payments or advances sufficient to allow Plaintiff to have funds in hand to commence necessary repairs or reconstruction.

124.    Plaintiff has repeatedly requested that Defendant fulfill its payment obligations under the Policy, so that it may lawfully proceed with repairs as required by Ohio law, but Defendant's delays have prevented Plaintiff from being able to do so within the two-year deadline set by the Policy.

125.    Defendant's delays have placed Plaintiff in an impossible position: Ohio law prohibits it from expending funds or entering contracts for repairs until insurance proceeds are paid, yet the Policy requires repairs within two years, regardless of funding availability.

126.     Even if Ashtabula had the funds necessary to comply with Ohio law and began the repair/replacement process as of the date of filing of this Complaint, they absolutely would not be able to have the repairs/replacements completed within two years after the December 1, 2024 date of Loss.

127.     Liberty Mutual is acutely aware of Ashtabula's concerns about the policy's time constraints and has made no overture to waive the two-year limitation, which is why Court intervention is sought in the form of a declaratory judgment action, pursuant to the Declaratory Judgement Act, 28 U.S.C. § 2201

128.     Enforcing the two-year policy limitation will result in a significant financial windfall for Liberty Mutual and significant financial hardship for the Ashtabula Area City School District.

129.     Enforcing the Policy's two-year time limit for incurring repair costs or claiming replacement cost when such performance is rendered impossible by (a) Defendant's own breach and delay in payment and (b) the mandates of Ohio law, would unjustly forfeit coverage, defeat the purpose of the insurance, and irreparably harm Plaintiff, a public entity with no ability to deviate from statutory requirements.

130.     Plaintiff requests a judicial declaration that Defendant's breach and failure to timely pay insurance proceeds prevented Ashtabula's compliance with the Policy's requirement to incur repair/replacement costs or complete repairs within two years, and where Ohio law prohibits Plaintiff from incurring such costs absent funds in hand, the referenced Policy deadlines for incurring costs and replacement cost payment are unenforceable as applied, and that coverage for such costs or replacement cost is not forfeited under these circumstances.

WHEREFORE, Plaintiff Ashtabula Area City School District respectfully requests that the Court grant declaratory relief as follows:

a. Declare that the Policy provisions imposing a two-year deadline for incurring costs or completing repairs as a condition to replacement cost payment or recovery of certain costs are unenforceable as applied where Liberty Mutual's breach and payment delays, in conjunction with Ohio Revised Code § 5705.412, have prevented Ashtabula from

lawfully expending funds or commencing repairs within the prescribed period;

b. Declare that Defendant is estopped from asserting the two-year Policy time limit as a basis for denying replacement cost or other covered payments under these circumstances;

c. Award such other relief as the Court deems just and proper.

## Count IV
## Bad Faith - – Both the High School and Additional Loss Locations

131.    The allegations contained in the preceding paragraphs of this Second Amended Complaint are incorporated by reference, as if set forth verbatim herein.

132.    Every contract in the State of Ohio – including the one between Liberty Mutual and the District here - requires the parties to act in good faith with all parties to the contract.

133.    Pursuant to Defendant's duty to act in good faith with Ashtabula, Defendant had to act honestly and fairly and show good faith towards Ashtabula when investigating the Claims.

134.    Pursuant to Defendant's duty to act in good faith with Ashtabula, Defendant is not to do anything that would destroy or damage Ashtabula's ability to receive benefits from the Policy related to the Losses.

135.    Pursuant to Defendant's duty to act in good faith with Ashtabula, Defendant is prohibited from exercising improper discretion and performing its contractual obligations in bad faith.

136.    Pursuant to Defendant's duty to act in good faith with Ashtabula, Defendant is not to act in a manner which is contrary to the spirit of the insurance Policy.

137.    Pursuant to Defendant's duty to act in good faith with Ashtabula, Defendant is not to take opportunistic advantage in a way that could not have been contemplated at the time of the entering into the insurance Policy.

138.    Pursuant to Defendant's duty to act in good faith with Ashtabula, Defendant is required to act honestly and reasonably, when seeking to enforce the terms of the Policy.

139.    Pursuant to Defendant's duty to act in good faith with Ashtabula, Defendant is required to conduct itself in a manner that is faithful to the Parties' agreed common purpose and in a manner consistent with the other party's justified expectations.

140.    Pursuant to Defendant's duty to act in good faith with Ashtabula, Defendant is not to act in bad faith, dishonestly, or with improper motive designed to destroy or damage Ashtabula's right to receive benefits or reasonable expectations of the Policy related to the Losses.

141.    Pursuant to Defendant's duty to act in good faith with Ashtabula, Defendant has a duty not to abuse its discretionary power.

142.    Pursuant to Defendant's duty to act in good faith with Ashtabula, Defendant cannot take advantage of Ashtabula's circumstances for its benefit.

143.    Defendant's actions or omissions, in failing to provide coverage to Ashtabula, after approving Ashtabula's Claim at the High School, or denying Claims at the Additional Loss Locations was a breach of its duty of good faith.

144.    Defendant repeatedly failed to provide sufficient explanation for its coverage decisions for the Losses.

145.    Defendant received multiple requests on June 17, 2025, September 22, 2025, and October 20, 2025, to issue payments for Ashtabula's incurred Extra Expenses at the High School, which are covered under the Policy.  Yet, Liberty Mutual has failed to issue full payment for Extra Expenses.

146.    Liberty Mutual has indicated it is not in agreement with the estimate and expert findings submitted by Ashtabula related to the Losses.  However, Liberty Mutual has failed to provide an explanation as to why full payment for the damages and Extra Expenses have not been

made for the High School or tendered benefits due and owing for the Additional Loss Locations.

147.    Liberty Mutual has failed to acknowledge or respond to communications within specified time frames.

148.    Liberty Mutual has been informed that its estimates do not incorporate all of the covered damages for the Losses, but has failed to correct the shortcomings in its estimates.

149.    Liberty Mutual has failed to conduct timely, appropriate investigations of the Claims and has been the source of unreasonable delays. Liberty Mutual was alerted to moisture concerns in academic wing of the High School in March 2025.  Yet, Liberty Mutual failed to conduct an inspection or any testing regarding the moisture concerns until June 17, 2025.

150.    Additional unreasonable delays were due to Liberty Mutual initially not having engineers investigate roof damage to the rear of the High School building.  Liberty Mutual did so only after the District hired engineers to outline the specific areas of damage for Liberty Mutual to inspect.

151.    Liberty Mutual's failure to act in good faith is further exemplified by its unilateral decision to remove the High School roof without any plan to protect the building or mitigate future damage to the building from it being exposed to the elements.

152.    Liberty Mutual has repeatedly failed to provide a sufficient explanation regarding its decisions as to what it believed the repairs should be, how those proposed repairs to bring the High School back to its pre-loss condition will be accomplished, and how the safety of the attending students and staff can be assured.

153.    Liberty Mutual's actions or omissions in not considering Sill's analysis of the cause of Ashtabula's damage at the High School, when denying Ashtabula's Claim under the Policy, was a breach of its duty of good faith.

154. Liberty Mutual has made unreasonable settlement offers for the Losses. After being apprised of an $8.6 million dollar shortfall in its own estimate for the High School, due to its neglecting to incorporate the costs for a temporary roof and necessary mitigation, it has failed to correct its estimate.

155. Pursuant to Liberty Mutual's duty to act in good faith with Ashtabula, Liberty Mutual cannot take advantage of Ashtabula's circumstances to its benefit. After Liberty Mutual's actions compromised the High School building, Liberty Mutual is now seeking to take advantage of the circumstances created by them, by blaming Ashtabula. Liberty Mutual is requiring Ashtabula to protect the High School at a cost of over $8 million dollars.

156. Liberty Mutual is requiring Ashtabula to conclude repairs or replacements by December 2026, while at the same time refusing to pay the necessary insurance funds to place the building in its pre-loss condition, which is preventing the District from making repairs. Liberty Mutual is taking this position knowing that Ashtabula must comply with Ohio Revised Code §5705.412 and have the funds prior to engaging in a contract to have the repair work performed.

157. Liberty Mutual's actions or omissions were done in a manner to take and/or attempt to take opportunistic advantage of Ashtabula, which was a breach of its duty of good faith.

158. Liberty Mutual, by pursuing its potential subrogation claim, has placed its own self-interest and financial gain above the District's interests.

159. Liberty Mutual has refused to pay for and authorize full demolition and reconstruction the High School, instead Liberty Mutual has insisted on pursuing cost-cutting dry out/remediate or salvage proposals that jeopardize the safety of students, staff and members of the community, thus prolonging the disruption by again placing its own self-interest and financial gain above the District's interests.

160. Liberty Mutual's actions or omissions in failing to act honestly and reasonably when seeking to enforce the terms of the Insurance Agreement in relation to the Losses, was a breach of its duty of good faith.

161. Liberty Mutual failed to conduct itself in a manner that was faithful to the agreed common purpose and in a manner consistent with Ashtabula's justified expectations, which was a breach of its duty of good faith in relation to Liberty Mutual's handling of the Losses.

162. Liberty Mutual's actions or omissions in relation to its handling of the Losses were done with a conscious disregard for the rights and safety of other persons that had a great probability of causing substantial harm.

163. Liberty Mutual's actions or omissions were such that the Defendant took advantage of Ashtabula's circumstances and used it to its benefit.

164. Liberty Mutual's actions or omissions were done in bad faith and/or with an improper motive that was designed to preclude and/or damage Ashtabula's right to receive the benefits or the reasonable expectations of the Policy.,.

165. Liberty Mutual has failed to exercise good faith in the processing of the Ashtabula Losses and its refusal to pay the Claims was not predicated upon circumstances that furnish reasonable justification therefor.

166. Liberty Mutual's actions or omissions were such that it proximately harmed Ashtabula's reputation, and/or relationships with its students, parents and other county residents and has also eliminated a disaster and nuclear shelter for the foreseeable future.

167. Liberty Mutual bad faith conduct in relation to its handling of the Losses was the proximate cause of the damages suffered by Ashtabula.

168. Liberty Mutual, by and through its representatives, told Ashtabula that Ashtabula's Claim for the High School damage was valid, and that Liberty Mutual would perform all the

26

contracted services for Ashtabula.

169.    Liberty Mutual made material representations with a reckless disregard for their falsity.

170.    Ashtabula justifiably relied upon Liberty Mutual's representations.

171.    As a direct and proximate result of Ashtabula's reliance upon Liberty Mutual's representations, Ashtabula has suffered other economic damages by having to house its displaced students for a protracted period of time and having incurred expenses exceeding the policy's limitation of $1,000,000 for Extra Expenses and all additional expenses incurred to protect itself from Liberty Mutual's inappropriate conduct, including costs and attorney's fees.

172.    Another indicator of Liberty Mutual's bad faith is the fact that just twelve days after the Claim herein was made, on December 13, 2024 Liberty Mutual served their Notice of Cancellation of the District's insurance Policies.  ***See Exhibit N.***

173.    The most glaring illustration of the Defendant's bad faith is that Liberty is aware that extremely toxic substances are contained within the concrete block walls of the High School.  Yet, Liberty Mutual is unwilling to eliminate that significant health concern.  Liberty is willing to risk the lives and wellbeing of the Lakeside High School students and staff with their proposed course of conduct.  Liberty Mutual's approach ignores the fact that there are numerous openings in virtually every wall in the school, such as light switches, electrical outlets, HVAC openings, etc. that will allow toxins to migrate into areas students will occupy.  Liberty Mutual's solution is to cross their fingers and hope  the toxins will inexplicably remain sealed within the concrete block walls forever.

## **PRAYER FOR RELIEF**

Pursuant to its statutory and common law rights, Plaintiff ASHTABULA AREA CITY SCHOOL DISTRICT respectfully requests the Court grant the following relief:

1.    Enter judgment for Plaintiff on all Counts and award compensatory damages, including all amounts due under the Policy and all additional damages caused by Defendant's breaches;

2.      Award restitution and pre- and post-judgment interest as permitted by law;

3.      Award consequential damages proximately caused by Defendant's breach of the election-to-repair agreement;

4.      Award extra-contractual and consequential damages for bad faith, including attorneys' fees where permitted, and punitive damages in an amount sufficient to punish and deter, as allowed by Ohio law;

5.      Award Plaintiff its costs of suit, including reasonable attorneys' fees, expert fees, and actual costs; and

6.      Grant such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiff demands a trial by jury of all issues triable of right by jury.

**MERLIN LAW GROUP, PLLC**

Date: February 12, 2026           /s/ W. Anthony Loe

                                          **W. Anthony Loe, Esq.**
                                          Ohio Bar No.: 0029528
                                          201 E. 5th Street, Suite 1900
                                          Cincinnati, OH 45202
                                          (513) 991-2160
                                          (513) 991-2253 (fax)
                                          WALoe@merlinlawgroup.com
                                          Ashtabula@merlinlawgroup.com
                                          Attorney for Plaintiff